UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| NATIONAL LAW CENTER ON, HOMELESSNESS AND POVERTY, *et al.*, <br><br>Plaintiffs, <br><br>v. <br><br>UNITED STATES DEPARTMENT OF VETERANS AFFAIRS, *et al.* <br><br>Defendants. | Civil No. 88-2503 (RCL) |

## MEMORANDUM OPINION

Title V of the Stewart B. McKinney Homeless Assistance Act of 1987 ("McKinney Act") requires federal agencies to make their unneeded property available for use by the homeless. 42 U.S.C. § 11411. Defendants have moved the Court to vacate a twenty-year-old judicial Order designed to ensure federal agencies' compliance with that statute. Defs.' Mot. To Vacate, ECF No. 568. Plaintiffs oppose this motion and seek a further expansion of the 1993 Order. Pls.' Mot., ECF No. 622. Because the Court finds troubling indications of widespread noncompliance, it will DENY defendants' motion to vacate and will GRANT plaintiffs' motion to expand the Order.

**I. BACKGROUND**

"While this is an old case, it's an important one, with real consequences for people who have fallen about as far down in the depths as one can in this country." *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs* ("*NLCHP Motion to Compel Decision*"), 842 F. Supp. 2d 127, 132 (D.D.C. 2012). Because the background of this case has

been reviewed many times, *see, e.g.*, *id.* at 129–30; *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.* ("*NLCHP Preemption Decision*"), 98 F. Supp. 2d 25, 26 (D.D.C. 2000); *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.* ("*NLCHP Summary Judgment Decision*"), 1988 WL 136958, *1–4, this opinion repeats only relevant details.

The McKinney Act (as amended) and implementing regulations set out the following process[1] for making certain federal property available to the homeless:

> *Canvassing of Agencies*: HUD is charged with performing a quarterly canvass of all federal landholding agencies to collect data on properties that are designated as "excess," "surplus," "unutilized," or "underutilized." 42 U.S.C. § 11411(a); 45 C.F.R. § 12a.3(a). Agencies have 25 days to respond. 42 U.S.C. § 11411(a); 45 C.F.R. § 12a.3(a)(2).
>
> *Suitability Determination*: Upon receipt of information from landholding agencies, HUD must identify which, if any, of these properties are "suitable" for use to assist the homeless within 30 days. 42 U.S.C. § 11411(a).
>
> *Availability Determination*: Once HUD determines that a property is "suitable" and notifies the landholding agency, the agency has 45 days to respond—either by making the property available, or explaining why the property cannot be made available, such as a "further and compelling Federal need for the property." 42 U.S.C. § 11411(b)(1).
>
> *Publication of Properties*: HUD is required to publish in the *Federal Register* a list of all properties deemed available as well as all other properties it reviewed in its initial canvass. 42 U.S.C. § 11411(c)(1); 45 C.F.R. § 12a.8.
>
> *Application for Properties*: Representatives of the homeless have 60 days from the date of publication to submit to HHS an "expression of interest" in an available property, 45 C.F.R. § 12a.9(a), and 90 days from then to apply for the property. *Id.* § 12a.9(d). HHS must take action within 25 days of receipt of an application. 42 U.S.C. § 11411(e).
>
> *Making Property Available*: If HHS approves an application, it must make the property available for use by the homeless in deed or lease of no less than one year in duration. 42 U.S.C. § 11411(f).
>
> *Outreach*: HUD, GSA, and HHS are to "make such efforts as are necessary to ensure the widest possible dissemination of the information" regarding available federal properties. 42 U.S.C. § 11411(c)(2)(B).

---

[1] What follows is a general outline of the statutory obligations, not a comprehensive account.

In 1988, plaintiffs[2] sued various federal agencies[3] for violating the Act. Judge Gasch entered permanent injunctive relief imposing requirements on defendants beyond those mandated under the statute (at the time). *NLCHP Summary Judgment Decision*, 1988 WL 136958. The Court subsequently modified and updated the Order on several occasions, most recently in 1993. *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.* ("*NLCHP Order Modification Decision*"), 819 F. Supp. 69 (D.D.C. 1993). The Order, as amended and consolidated in the 1993 opinion, now overlaps substantially with the statute (as amended).

Two decades later, defendants moved to vacate the 1993 Order. *See* Defs.' Mot. Because the motion "contain[ed] no evidence supporting their claim that changed circumstances warrant this Court's exercise of its equitable powers to dissolve the longstanding injunction," the Court granted (in part) plaintiffs' motion to compel discovery. *NLCHP Motion to Compel Decision*, 842 F. Supp. 2d at 129, 131. Plaintiffs now oppose defendants' motion to vacate and have asked this Court to further expand the Order.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(5) permits a party to obtain relief from a judgment or order if "applying [the judgment or order] prospectively is no longer equitable." The Rule "provides a means by which a party can ask a court to modify or vacate a judgment or order if a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Horne v. Flores*, 557 U.S. 433, 447 (2009) (internal quotations and citations omitted). "If a durable remedy has been implemented, continued

---

[2] Plaintiffs in the original action included a homeless person—John-Ed Croft—and several non-profit organizations serving the homeless—the Association to Benefit Children, Middlesex Interfaith Partnership with the Homeless, the H.O.M.E. Front, Inc., and the National Center on Homelessness and Poverty.

[3] Defendants are the Veterans Administration ("VA"), the VA's Administrator, the Department of Defense ("DOD"), the Secretary of DOD, the Department of Housing and Urban Development ("HUD"), HUD's Secretary, the General Services Administration ("GSA"), GSA's Administrator, the District of Columbia Department of Human Services ("DC DHS"), and DC DHS's Secretary.

enforcement of the order is not only unnecessary, but improper." *Id.* at 450. "The party seeking relief bears the burden of establishing that changed circumstances warrant relief but once a party carries this burden, a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Id.* at 447 (internal quotations and citations omitted).

## III. ANALYSIS

The Court's analysis will proceed in three parts. First, defendants' motion to vacate the Order will be denied. Second, plaintiffs' motion to enlarge the Order will be granted. Third, the Court will undertake some "housekeeping"—updating the Order to reflect certain changes in the intervening decades since it was last amended.

### A. Defendants' Request to Vacate the Order Is Denied

#### 1. Defendants have Failed to Establish that a Durable Remedy Has Been Implemented

Defendants have failed to meet their burden of "establishing that changed circumstances warrant relief." *Horne*, 557 U.S. at 447. They claim to have "eliminated the systematic causes of the alleged violations that formed the basis of this lawsuit" and to have "implemented a robust system for complying with Title V of the McKinney Act," rendering the Order no longer necessary. Defs.' Reply 8. To that effect, they also claim an "eighteen-year unblemished record of compliance" and argue that, "[b]ecause the remedy provided by the Order has been achieved and is demonstrably durable . . . ongoing enforcement is unnecessary."[4] Defs.' Mot. 1, 6–7. But

---

[4] Defendants point to five categories of evidence purportedly demonstrating their ongoing compliance:

1. *HUD Procedures*: Procedures implemented at HUD to ensure compliance with its obligations to (i) canvass other agencies, (ii) make suitability determinations, and (iii) make availability determinations. Defs.' Reply 8. Defendants' evidence consists of deposition testimony by a HUD official describing these processes. Dep. of Ann Marie Oliva ("HUD Dep.") 33:3–34:24, 60:17–61:22, 77:11–78:16, 93:14–97:5, 104:12–19, ECF No. 622-28.

2. *GSA Procedures*: Procedures implemented at GSA to screen properties for availability. Defs.' Reply 8. Defendants' evidence consists of deposition testimony by a GSA official describing this process. Dep. of Ralph Connor ("GSA Dep.") 61:22–62:17, 126:14–132:16, ECF No. 623-1.

while plaintiffs concede that "[d]efendants generally have procedures in place to implement the statutory directives *once properties are appropriately reported to GSA and/or HUD*,"[5] Pls.' Mem. 31, they also identify systemic failures at the front-end of the Title V process that preclude this Court from finding a change in circumstances warranting vacating the Order.

Many landholding agencies appear to be failing to fairly and accurately report their Title V eligible property, as required under both the statute and Order. Plaintiffs point to the large discrepancy between relatively modest numbers of properties reported to HUD pursuant to the Act (and published in the *Federal Register*) and the much larger number of federal properties listed in other governmental reports and statements. *See* Pls.' Mem. 8–12, 35–41; Pls.' Reply 3–7. On the one hand, plaintiffs' analysis shows that between 1995 and 2011, a total of 27,745 unique properties were reviewed and recorded pursuant to the Act in the *Federal Register*.[6] Decl. of Christopher Makuc ¶¶ 11–13, ECF No. 622-9. On the other hand, a September 2010 memorandum by the Office of Management and Budget ("OMB") stated that "[*c*]*urrently*, Federal agencies operate and maintain more real property assets than necessary, with 14,000

---

    3. <u>HUD & GSA Recordkeeping</u>: HUD and GSA "maintain extensive records documenting their compliance with Title V requirements." Defs.' Reply 8. Defendants' evidence consists of a list of the categories of records kept by HUD, Defs.' First Interrog. Resp. 18–20, ECF No. 628-2, and by GSA, *id.* 45–46.

    4. <u>HHS Procedures</u>: Procedures implemented at HHS to ensure the application process "complies with the requirements set forth in the Order." Defs.' Reply 9. Defendants' evidence consists of a list of HHS's revisions to the instructions included with the applications for available property. Defs.' Mot. 10–11; Defs.' First Interrog. Resp. 80–83.

    5. <u>HUD, GSA & HHS Outreach</u>: All three agencies have "taken steps to ensure outreach to homeless providers." Defs.' Reply 9. Defendants' evidence consists of a catalogue of outreach activities, including publications in the federal register, mailings to plaintiffs and other organizations, webpages, and a call center. Defs.' First Interrog. Resp. 40–41, 73–75, 79–80.

[5] Plaintiffs do, however, assert continuing problems at the suitability determination, application, and outreach stages of the process. Pls.' Mem. 32–34. Defendants reply to these allegations. Defs.' Reply 14–20. The Court need not resolve this dispute because, as discussed above, it finds adequate evidence of noncompliance in the form of plaintiffs' evidence of landbanking.

[6] HUD is required to publish all properties it reviews, collected in its initial canvasses from the agencies. 42 U.S.C. § 11411(c)(1).

buildings and structures designated as excess and 55,000 identified as either under- or not-utilized." Presidential Mem., Accountable Government Initiative, Sept. 14, 2010,[7] ECF No. 622-4 (emphasis added). And, in a July 2011 House Committee on Oversight and Government Reform hearing, several Congressmen referred to information provided by OMB revealing that there were 14,000 "excess" properties and 76,000 that were "under-utilized." *Disposal of Real Property: Legislative Proposals: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 112th Cong. (2011), ECF No. 622-42.

These figures present a significant discrepancy. OMB states that there were almost 100,000 excess or underutilized properties at one single moment—more than three times the total number of properties reviewed under the Act *over the course of 16 years*. Landholding agencies appear to be hiding potentially eligible properties from the Title V process. A GSA official's testimony in 2011 before a Senate Subcommittee lends additional support to this interpretation:

> When we ask agencies, well, how about this property out there, it looks like you're not using it terribly intensively, often the answer is well, but things'll change. We might need it. And so in essence we have some federal agencies—and GSA—I'm—I'll have to admit in some cases has done this too—that *the agencies are in essence landbanking the property*. And to be able to say to them I don't really think you need that, and it's time to—it's time to move on an[d] time to think differently about how you do your function and go someplace else—that's something that we could use a little bit more clout to do.[8]

*Federal Asset Management*, *Eliminating Waste by Disposing of Unneeded Federal Property, Hearing Before the Fed. Fin. Mgmt., Gov't Info., Fed. Servs., & Int'l Sec. Subcomm. of the S. Comm. on Homeland Sec. & Gov't Affairs*, 112th Cong. (2011) (statement of Robert Peck) ECF No. 622-17.

---

[7] *Available at* http://www.whitehouse.gov/the-press-office/2010/09/14/presidential-memorandum-accountable-government-initiative.

[8] Defendants object to plaintiffs' reliance on the allegedly "improperly obtained" testimony from this now former GSA official. Defs.' Reply 20 n.16. Without addressing the merits of this objection, the Court is satisfied that these objections do not bar the Court from considering the testimony cited above which was given in a Senate Subcommittee hearing while he was still in office.

Defendants do not contest plaintiffs' factual assertion that agencies are landbanking. They all but concede that plaintiffs' interpretation of the numerical discrepancy suggests that agencies are keeping Title V eligible land off the books. *See* Defs.' Reply 20–21. Rather, defendants insist that this practice is irrelevant to the Court's task of assessing whether defendants have demonstrated compliance with the 1993 Order because the landholding agencies' initial "property designation decisions are committed to agency discretion by law" and are therefore "outside the scope of the 1993 order" and beyond this Court's authority to review. Defs.' Reply 21. Defendants' position is that landholding agencies may freely opt out of the Act and Order without violating either simply by refusing to provide accurate information about potentially eligible properties when that information is solicited. Defs.' Reply 21 ("Defendants have no control over property designation decisions made by other government agencies. Thus, such agency designation decisions are simply irrelevant to defendants' compliance with the 1993 Order." (citations omitted)). Based on their behavior, the landholding agencies appear to have endorsed this view.

The Court disagrees. Under the APA, courts have jurisdiction to review agency inaction where the agency has failed to take a "discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004). Separately, courts also have "broad discretion in using its inherent equitable powers to ensure compliance with [their own] orders." *NLCHP Motion to Compel Decision*, 842 F. Supp. 2d at 131.

The 1993 Order imposes reporting requirements on landholding agencies in unmistakably mandatory terms. *NLCHP Order Modification Decision*, 819 F. Supp. at 77 ¶ 4 (ordering that landholding agencies "*shall* report to HUD, no more than 25 days after receiving HUD's request for information, any and all excess, surplus, unutilized, or underutilized properties owned or

controlled by the agencies" (emphasis added)). The Order enumerates four categories of property that each landholding agency must disclose: surplus, excess, unutilized, and underutilized. The statute defines "excess" property as "property under the control of a federal agency that the head of the agency determines is not required to meet the agency's needs or responsibilities." 40 U.S.C. § 102(3); *see also* 42 U.S.C. § 11411(i)(2) (adopting definition). This definition undoubtedly accords a fair measure of discretion to the agency. However, this discretion is not without limit: a landholding agency *must* list any property as "excess" that meets the definition and may avoid listing a property as "excess" *only if* it does not. Each listing determination is, therefore, a "discrete agency action that it is required to take" and is thus amenable to this Court's review. *SUWA* 542 U.S. at 64; *see also* Defs.' Reply 22.[9]

The statute itself does not define "unutilized" or "underutilized" property, but implementing regulations establish the following definitions: "Unutilized property means an entire property or portion thereof, with or without improvements, not occupied for current program purposes for the accountable Executive agency or occupied in caretaker status only." 41 C.F.R. § 102-75.1160; *accord* 45 C.F.R. § 12a.1; 24 C.F.R. § 581.1. "Underutilized means an entire property or portion thereof, with or without improvements, which is used only at irregular periods or intermittently by the accountable landholding agency for current program purposes of that agency, or which is used for current program purposes that can be satisfied with only a portion of the property." 41 C.F.R. § 102-75.1160; *accord* 45 C.F.R. § 12a.1; 24 C.F.R. § 581.1. Again, these definitions confirm that the 1993 Order's requirement that agencies report all

---

[9] The statutory definition of "surplus" property incorporates that of "excess" property. *See* 40 U.S.C. § 102(10); *see also* 42 U.S.C. § 11411(i)(2) (adopting definition). Thus, the same analysis applies.

properties conforming to these definitions creates "discrete agency action[s] that it is *required to take*" and which are not beyond this Court's review.[10] *SUWA*, 542 U.S. at 64.

Even if there were no authority for jurisdiction over landbanking as a statutory violation, the Court would still be within its broad equitable discretion to find that landbanking violates its 1993 Order. *See NLCHP Motion to Compel Decision*, 842 F. Supp. 2d at 131. Agencies' failure to accurately respond to HUD canvasses runs afoul of the Order's requirement that HUD "collect information regarding *all* property declared excess or surplus, . . . unutilized or underutilized . . . ." Order ¶ 2.

In sum, landbanking, which defendants concede has been occurring in significant volume, constitutes a serious violation of both the Act and the 1993 Order. Accordingly, the Court concludes that defendants cannot show that a "durable remedy" has been implemented and will DENY defendants' motion to vacate the Order.

### 2. The Fact that Some Provisions in the 1993 Order Are Codified in Federal Statutes Does Not Require Vacating the Order

Defendants further argue that the Order should be vacated as unnecessary because many of its provisions have been codified in federal statutes and regulations. Defs.' Mem. 7–12. This argument also fails.

Rule 60(b) "provides a means by which a party can ask a court to modify or vacate a judgment or order if a *significant change . . . in law* renders continued enforcement detrimental to the public interest." *Horne v. Flores*, 557 U.S. at 447 (emphasis added).

Here, the government concedes that the vast majority of the federal statutes and regulations that it relies on were enacted and promulgated in 1990 and 1991.[11] Defs.' Mem. 7.

---

[10] Defendants argue that these definitions apply only to HUD, GSA, and HHS who promulgated them and not to other landholding agencies. Defs.' Reply 22 n.17. However, defendants fail to explain what definition these agencies *do* apply. Regardless, as the Court explains above, even without any fixed definition, the Court would still have authority to find landbanking a violation of its Order.

Judge Gasch entered the updated version of the Order in 1993. The statutes and regulations in question were already in place when Judge Gasch entered the Order. Accordingly, there has been no "significant change in law" since the 1993 Order justifying relief under Rule 60(b). *See Nat'l Law Ctr. On Homelessness & Poverty v. U.S. Veterans Admin.*, 88-cv-2503, 1992 WL 44324, *1–2 (D.D.C.) (rejecting a similar argument).

### B. The Court Grants Plaintiffs' Request to Expand the Order to Combat Landbanking

Having recognized landbanking as a threat to compliance with the 1993 Order, the Court now considers plaintiffs' request to expand the Order to combat this problem.

Again, and "[a]s noted . . . by Judge Gasch and this Court at various stages of this litigation, a federal court has broad discretion in using its inherent equitable powers to ensure compliance with its orders." *NLCHP Motion to Compel Decision*, 842 F. Supp. 2d at 131 (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991)). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (quoting *Chambers*, 501 U.S. at 43).

Plaintiffs propose amending the Order to require GSA or HUD to annually check the responses to their canvasses from landholding agencies against a database of federal properties maintained by GSA known as the Federal Real Property Profile ("FRPP"). Pls.' Mem. 42–45. The FRPP database arises out of a 2004 Executive Order, *see* Executive Order 13327, directing GSA to "establish and maintain a single, comprehensive, and descriptive database of all real property under the custody and control of all executive branch agencies . . . ." 69 Fed. Reg. 5897, 5899 (Feb. 4, 2004).

---

[11] The few exceptions are discussed below in the "housekeeping" section.

This database is the source of the OMB figures cited above and appears to be an appropriate and useful comparator. Like Title V, the FRPP requires agencies to report properties that are, *inter alia*, "excess and surplus," 41 C.F.R. § 102-84.40(d), as well as "underutilized" and "unutilized," *see* U.S. Gov't Accountability Office, GAO-12-645, *Federal Property: National Strategy and Better Data Needed to Improve Management of Excess and Underutilized Property* (2012) ("GAO Report"), *available at* http://www.gao.gov/assets/600/591751.pdf. A GSA official gave testimony indicating that GSA, as a landholder, treats the term "excess" as identical under Title V as in the FRPP. GSA Dep. 104:11–105:11, 118:13–120:14. Similarly, a GAO Report on the FRPP relies on the same definition of "excess" and "underutilized" property as Title V. *See* GAO Report 2 n.4.

The defendants complain that these terms are not defined identically across the two programs because different agency officials are charged with implementation: while "the head of each agency is responsible . . . for determining whether a property is excess for McKinney Act purposes," "other agency officials may report properties to the FRPP" so that "there is no certainty that a property reported as excess in the FRPP database would necessarily be deemed excess by the head of the agency for purposes of McKinney Act disposal." Defs.' Reply 26. While defendants correctly acknowledge that there is apparently little or no consistency across and within agencies regarding compliance with the McKinney Act and the FRPP, this is precisely the problem. While this personnel difference might help *explain* the gulf between the results obtained by the FRPP and McKinney Act surveys, it certainly does not *justify* it.

Plaintiffs suggest that an annual comparison between the properties reported under FRPP and the McKinney Act might "provide a simple, useful and comprehensive tool to assess compliance." Pls.' Reply 16. This Court agrees and will enter an Order accordingly.

The Court will further order GSA and HUD to develop a plan for additional and improved training programs for landholding agencies that will ensure they are complying with the reporting requirements of the Act and Order.

**C. Housekeeping**

One provision in the 1993 Order has been superseded by subsequently enacted statutes. The last three sentences of paragraph 15 of the 1993 Order require that in each community where a military base closure is scheduled defendants sponsor a workshop or seminar to educate potential applicants about the McKinney Act program. This requirement has been superseded by a provision of the Base Closure Community Redevelopment and Homeless Assistance Act of 1994, Pub. L. No. 103-421 (Oct. 25, 1994) (codified at 42 U.S.C. § 11411(h)(1)), which makes the McKinney Act inapplicable to these facilities. *See* Pls.' Mem. 23–24; Defs.' Mem. 12. Accordingly, the Court will remove those sentences from the Order.

Defendants argue that two other provisions of the 1993 Order should be removed as "obsolete." First, they point to paragraph 10 of the Order, which requires that HHS indicate in the application packet that a certain publication is available which lists possible sources of funding is available. Defendants argue, and plaintiffs concede, that this publication, entitled *Federal Programs to Help Homeless People*, has not been published since 1993. *See* Defs.' Mem. 11 n.7; Pls.' Mem. 24. However, as plaintiffs show, the publication remains available and may still be purchased through HUD online. *See* HUD User Web Store, *Federal Programs to Help Homeless People* (1993), *available at* http://webstore.huduser.org/catalog/product_info.php/cPath/2/ products_id/7548. Accordingly, the Court will not vacate this provision.

Second, defendants point to paragraph 14 of the Order, which directs HHS to "allow an intent to apply for Title IV funds to be sufficient to satisfy the homeless provider's financial showing requirement." *See* Defs.' Mem. 14–15. Defendants argue that this requirement has become obsolete because homeless providers no longer apply directly to HUD for financial assistance, but rather these applications are "funneled through . . . a 'Continuum of Care' . . . a local network of homeless assistance providers, state and local governments." Defs.' Mem. 15. The Court does not find that this change in the underlying funding regimes affects the command in paragraph 14 and will not vacate this provision.

## IV.  CONCLUSION

For the foregoing reasons, the Court will DENY defendants' motion to vacate the Order, and will GRANT plaintiffs' motion expand the Order.

An Order shall issue with this opinion.

Signed by Royce C. Lamberth, Chief Judge, on March 21, 2013.